IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:22-CT-3207-D

RICHARD NORDAN, ESQ., as administrator )
of the estate of Eric Avila Cruz, )
 )
            Plaintiff, )
 ) **ORDER**
       v. )
 )
MICHAEL CARSON, et al., )
 )
            Defendants. )

On June 29, 2022, Richard Nordan ("Nordan" or "plaintiff"), as administrator of the estate of Eric Avila Cruz ("Cruz" or "decedent"), filed this action against, inter alia, Southern Health Partners, Inc. ("SHP"), physician's assistant Dawn Hines Gerrell ("Gerrell"), nurse Bridget Southerland ("Southerland"), nurse Lacey Welsh ("Welsh"), and nurse Marsharicka Craig ("Craig") (collectively "defendants"). See Compl. [D.E. 1]; cf. [D.E. 118]. In the remaining claims, Nordan alleges (1) deliberate indifference to serious medical needs by Gerrell, Southerland, Welsh, and Craig under 42 U.S.C. § 1983 ("count one"); (2) a policy or custom of deliberate indifference to serious medical needs by SHP under 42 U.S.C. § 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) ("count three"); and (3) state-law medical malpractice by SHP, Gerrell, Southerland, Welsh, and Craig ("count six"). See Compl. ¶¶ 201–211, 226, 243–252, 272–84; cf. [D.E. 118].

On January 13, 2025, defendants moved for summary judgment [D.E. 94] and filed exhibits [D.E. 97–98, 100–01], a statement of material facts ("DSMF") [D.E. 96], and a memorandum in support [D.E. 94]. See Fed. R. Civ. P. 56. On March 7 and 10, 2025, Nordan responded in

opposition [D.E. 104], filed a statement of material facts ("PSMF") [D.E. 105], an additional statement of material facts ("PSAMF") [D.E. 106], and exhibits [D.E. 107–08, 111]. On March 28, 2025, defendants replied [D.E. 115] and filed a statement of additional material facts ("DSAMF") [D.E. 116]. The parties also have moved to seal certain exhibits, including plaintiff's appendix. See [D.E. 94, 99, 110, 112].[1] As explained below, the court grants the parties' motions to seal and grants in part defendants' motion for summary judgment. The court dismisses count one against Craig and Gerrell and dismisses count three.

I.

The court recounts the evidence in the light most favorable to the non-movant. See Scott v. Harris, 550 U.S. 372, 378 (2007). Cruz was admitted to the Johnston County Detention Center ("the Jail") "[i]n the early morning of January 13, 2021," and he died in the Jail on January 19, 2021. DSMF ¶¶ 10, 46; see PSMF ¶¶ 10, 46. Cruz's health deteriorated significantly in those six days. Moreover, Cruz's need for medical treatment was obvious, and both Jail correctional staff and Cruz's fellow inmates repeatedly sought medical care for Cruz. See PSAMF ¶¶ 32, 34–40, 52–55, 64, 66–73; DSMF ¶¶ 26, 28–29; cf. DSAMF ¶¶ 32, 34–40, 52–55, 64, 66–73; PSMF ¶¶ 26, 28–29.

Cruz had kidney disease, took high blood pressure medicine, and "had a prescription to receive hemodialysis treatment three times per week." DSMF ¶ 10; PSAMF ¶ 4; see DSMF ¶ 11; PSMF ¶ 10–11; cf. PSAMF ¶ 15; DSAMF ¶¶ 4, 15. "The Jail did not have the medical facilities or resources to provide hemodialysis treatment," and "inmates . . . who needed hemodialysis would have to be transferred . . . to a dialysis facility or to the local hospital." DSMF ¶ 6; see PSMF ¶ 6.

---

[1] The court grants plaintiff's motion to manually file three video exhibits [D.E. 109]. Plaintiff's motion to manually file exhibit 47 is moot. Compare [D.E. 109], with [D.E. 111].

2

Jail medical staff generally identified inmates' need for outside medical treatment and made arrangements to schedule that treatment while Jail correctional staff provided transportation to outside medical appointments. Compare PSAMF ¶¶ 20–21, and DSMF ¶¶ 7–8, with DRSMF ¶¶ 20–21, and PSMF ¶¶ 7–8. Defendants made no arrangements for Cruz to receive dialysis. See PSAMF ¶¶ 11, 26, 35, 48, 72; cf. DSAMF ¶¶ 11, 26, 35, 48, 72; DSMF ¶ 16; PSMF ¶ 16.

Medustrial, a travel nursing company, contracted with SHP for . . . Craig to provide nursing care to inmates at the Jail." DSMF ¶¶ 2–3; see PSMF ¶¶ 2–3. "When scheduled, Nurse Craig was generally present for shifts at the Jail from 2:30 p.m. to 11 p.m." DSMF ¶¶ 2–3; see PSMF ¶¶ 2–3. Cruz met with Craig the afternoon of January 13, 2021, for a medical screening. See DSMF ¶ 11; PSMF ¶ 11. "Cruz reported to . . . Craig that he had chronic kidney disease, that he was prescribed hemodialysis treatment three times per week, and that he had voluntarily missed his dialysis appointment for the prior day, January 12, 2021, and had not had dialysis since January 9, 2021." DSMF ¶ 11; see PSMF ¶ 11. Cruz "had an AV fistula in his left arm, a device used to facilitate frequent dialysis treatment, which [Craig] assessed." PSAMF ¶ 4; see DSAMF ¶ 4; DSMF ¶ 11; PSMF ¶ 11. "[B]ecause [Cruz] had a fistula in his arm, [Craig] knew that he was a dialysis patient . . . . [and] was well aware that he needed dialysis." PSAMF ¶¶ 5–6 (cleaned up); see DSAMF ¶ 5; cf. DSAMF ¶ 6.

Craig obtained Cruz's authorization to release his medical records from medical providers, including his dialysis provider Fresenius, "and sent a fax to [Fresenius] requesting records." PSAMF ¶ 7; see DSAMF ¶ 7; DSMF ¶ 12; cf. PSMF ¶ 12. Craig saw Cruz again that day "to follow up on issues unrelated to his dialysis needs." PSAMF ¶ 8; cf. DSAMF ¶ 8; DSMF ¶ 13; PSMF ¶ 13. "[Cruz] also reported to . . . Craig that he had urinated three times since he was last evaluated by her." DSMF ¶ 13; cf. PSMF ¶ 13. Craig concluded her shift and left Cruz's chart

for Southerland to review. See DSMF ¶ 14; cf. PSMF ¶ 14; PSAMF ¶ 10; DSAMF ¶ 10. The parties dispute whether Fresenius called Craig and faxed her Cruz's medical records. Compare PSAMF ¶ 9 & n.1, and DSMF ¶ 17, with DSAMF ¶ 9. The parties also dispute whether Craig answered this phone call or reviewed the faxed records. Compare PSAMF ¶ 9 & n.1, with DSAMF ¶ 9.

On January 14, 2021, Craig "spoke to Southerland, asking whether . . . Southerland had reviewed [Cruz's] chart. [Southerland] indicated to [Craig] at that time that [Cruz's] dialysis treatment was being handled." DSMF ¶ 16; see PSMF ¶ 16. The same day, Jail staff brought Cruz to the medical station because he reported not feeling well, and Craig "examined [Cruz], but did not inquire further about his dialysis need nor take any action to secure treatment for him." PSAMF ¶ 8; see DSMF ¶ 19; cf. DSAMF ¶ 8; PSMF ¶ 19. "Cruz was given his blood pressure medication while in the medical office, and new orders were written for [Cruz] to receive that blood pressure medication going forward." DSMF ¶ 19; cf. PSMF ¶ 19. Craig saw Cruz one more time "during inmate temperature checks, [and Cruz] informed [Craig] that he was feeling better after taking his blood pressure medication." DSMF ¶ 20; cf. PSMF ¶ 20. Craig "was not present at the Jail for any shifts until after [Cruz's] death" and had no further involvement in Cruz's medical care. DSMF ¶ 21; compare id., and PSMF ¶ 21, with PSAMF ¶ 10, and DSAMF ¶ 10.

SHP employed Nurse Southerland as the Medical Team Administrator for the Jail. See DSMF ¶¶ 2–3; see PSMF ¶¶ 2–3. Southerland "was the next member of the medical staff involved in [Cruz's] care." PSAMF ¶ 16; cf. DSAMF ¶ 16. On January 15, 2021, Southerland reviewed Cruz's medical chart and "was aware that [Cruz] was a dialysis patient who had been without treatment" for several days. PSAMF ¶ 16; cf. DSAMF ¶ 16. Cruz's "missed dialysis treatments

4

made it even more urgent for him to receive care without delay." PSAMF ¶ 19; cf. DSAMF ¶ 19 (noting that Cruz "had previously gone similar lengths of time between dialysis appointments").

Southerland called Fresenius "and learned of [Cruz's] long history of noncompliance with his dialysis treatments." DSMF ¶ 22; see PSMF ¶ 22. Fresenius "reported that [Cruz] would often show up late, leave early, and arrive under the influence of marijuana and/or cocaine, and sometimes was violent towards staff." DSMF ¶ 22; see PSMF ¶ 22. The parties agree that Cruz's "history could not be properly used as a justification to deny dialysis treatment to [Cruz]." PSAMF ¶ 18; see DSAMF ¶¶ 17–18; DSMF ¶¶ 22–23; PSMF ¶¶ 22–23.

Southerland reviewed Cruz's records from Fresenius and met with "the Chief Jailer, Captain Michael Carson." PSAMF ¶ 23; see DSMF ¶ 24; cf. DSAMF ¶ 23; PSMF ¶ 24. Southerland "brought with her . . . a page of [Cruz's] medical records documenting his pre-incarceration noncompliance with treatments," and Carson "believed she was speaking with him to complain about [Cruz's] pre-arrest behavior as a patient." PSAMF ¶¶ 23–25; cf. DSAMF ¶¶ 23–25. The parties dispute what Southerland and Carson discussed, including whether Southerland informed Carson of Cruz's need for dialysis and whether Carson instructed Southerland not to schedule Cruz for dialysis, or simply believed he needed to flag Cruz as a safety and security risk and await further information from medical staff as to Cruz's need for transportation to medical treatment. Compare DSMF ¶ 24, and DSAMF ¶¶ 25–29, with PSAMF ¶¶ 25–29, and PSMF ¶ 24 & n.2.

SHP employed Nurse Welsh to provide nursing care to inmates at the Jail, and she "was generally present for twelve-hour shifts at the Jail three days per week." DSMF ¶¶ 2–3; see PSMF ¶¶ 2–3. "At or around 1:20 p.m. on January 15, 2021, Nurse Welsh was called to [Cruz's] cell for medical attention." DSMF ¶ 26; see PSMF ¶¶ 30–31; DSAMF ¶ 30; cf. PSMF ¶ 26; DSAMF ¶

5

31. Welsh "knew that [Cruz] was a dialysis patient and that he had not had treatment for several days." PSAMF ¶ 30; see DRSMF ¶ 30.

While Welsh was standing at Cruz's cell, Cruz was sitting on the floor. See DSMF ¶ 26; see PSMF ¶ 26. Cruz reported that he "tried to stand up to use the bathroom and fell, and reported that he was weak and in pain." DSMF ¶ 26; see PSMF ¶ 26. Welsh told Cruz that "if he wanted to be seen by medical staff, he would need to go to the medical office." DSMF ¶ 26; see PSMF ¶ 26. Cruz then walked to the medical office and stated that he was weak, "needed his treatments," and had "non-specific pains." DSMF ¶ 28; see DSMF ¶ 27; PSMF ¶¶ 27–28. The only medical care Welsh provided Cruz at this visit was a blood pressure reading and a dose of his prescribed blood pressure medication. See PSAMF ¶ 35; DSAMF ¶ 35. Welsh did not conduct a physical examination of Cruz, nor did she document anything about Cruz's urine, both things she acknowledges were required by her standard of care. See PSAMF ¶ 35; DSAMF ¶ 35. As Cruz stood up to leave, he leaned forward and fell to the floor. See DSMF ¶ 29; PSMF ¶ 29. A Jail officer then assisted Cruz off the floor and escorted Cruz back to his cell. See DSMF ¶ 29; PSMF ¶ 29; cf. PSAMF ¶¶ 32, 34; DSAMF ¶¶ 32, 34. The only medical record for Cruz on January 16 and 17, 2021, are blood pressure checks which Welsh recorded two days after Cruz's death. Compare DSMF ¶ 34, with PSMF ¶ 34.

On January 18, 2021, Jail staff brought Cruz to the medical station, where Welsh examined him. See PSAMF ¶¶ 54–55; cf. DSAMF ¶¶ 54–55; DSMF ¶¶ 36–37; PSMF ¶¶ 36–37. Welsh reported that "Cruz continued to experience pain and had difficulty walking and moving," and that she "educated him on the importance of keeping his legs and body moving when able." PSAMF ¶ 55 (cleaned up); cf. DSAMF ¶ 55; DSMF ¶ 37; PSMF ¶ 37.

6

Gerrell was "a physician extender and provider at the Jail." DSMF ¶ 4; cf. PSMF ¶ 4. On January 15, 2021, "Gerrell came to the Jail for her weekly two-hour shift." PSAMF ¶ 45; see DSMF ¶¶ 4, 32; DSAMF ¶ 45; PSMF ¶¶ 4, 32. Gerrell knew that Cruz needed dialysis, knew that he was supposed to receive it three times a week, and knew that he had been without it for six consecutive days. See PSAMF ¶ 45; DSMF ¶¶ 4, 32; DSAMF ¶ 45; PSMF ¶¶ 4, 32. Gerrell also knew that denying dialysis to a patient like Cruz "could result in death." PSAMF ¶ 45; see DSMF ¶¶ 4, 32; DSAMF ¶ 45; PSMF ¶¶ 4, 32. The parties dispute whether Gerrell served in a supervisory capacity over the Jail nursing staff and whether Welsh told Gerrell that Cruz was a security risk preventing his transport and was refusing dialysis. Compare DSMF ¶ 32, and PSAMF ¶¶ 47, 50 n.4, with PSMF ¶ 32, and DSAMF ¶ 47.

Gerrell entered a note in Cruz's medical chart directing nursing staff "to counsel [Cruz] on the importance of compliance with medically necessary procedures, i.e. dialysis, and the severe health risks associated with noncompliance." DSMF ¶ 33; see PSAMF ¶ 50. Gerrell did not ensure that Cruz's counseling occurred. See PSAMF ¶¶ 49–50; cf. DSAMF ¶¶ 49–50. Gerrell did not visit Cruz's cell or examine him personally. See PSAMF ¶¶ 49–50; cf. DSAMF ¶¶ 49–50. Gerrell did not inquire further about why Cruz had not received treatment. See PSAMF ¶¶ 49–50; cf. DSAMF ¶¶ 49–50. Gerrell did not request or schedule a dialysis appointment. See PSAMF ¶¶ 49–50; cf. DSAMF ¶¶ 49–50. Gerrell did not "call to check on Mr. Cruz's status nor attempt to clear any improper barriers to his care." PSAMF ¶ 51; cf. DSAMF ¶¶ 51, 53. "At no other time between [Cruz's] booking at the Jail on January 13, 2021, and his death on January 19, 2021, did any of the nurses call [Gerrell] or otherwise contact her about Mr. Cruz, outside of her visit to the Jail on January 15, 2021." DSMF ¶ 34; see PSMF ¶ 34.

On January 18, 2021, Amy Brannan ("Brannan"), a Fresenius clinical manager, contacted the Jail and spoke with Southerland to discuss Cruz. See PSAMF ¶ 59; DSMF ¶ 39; cf. PSAMF ¶ 56 (describing an additional, earlier phone call to the Jail from a different Fresenius nurse). After the phone conversation between Brannan and Southerland, Fresenius "faxed documentation of . . . refusal to treat [Cruz] to the medical staff at the Jail." DSMF ¶ 40; see PSAMF ¶ 40; cf. PSAMF ¶ 62; DSAMF ¶ 62. The parties dispute what Brannan and Southerland discussed. Compare PSAMF ¶¶ 57–58, 60–62; with DSAMF ¶¶ 57–58, 60–62. Nordan contends that Southerland made false statements about Cruz to Brannan and requested the treatment refusal fax from Fresenius. See PSAMF ¶¶ 60–61. Defendants contend that Fresenius would no longer accept Cruz for dialysis treatments due to perceived safety risks. See DSAMF ¶¶ 60–61.

On January 19, 2021, a Jail officer assisted Cruz to the mental health office. See DSMF ¶ 41; PSMF ¶ 41. "Nurse Southerland was present in the treatment room during this visit." DSMF ¶ 41; see PSAMF ¶ 65; cf. PSMF ¶ 41. Nordan has presented evidence that the officer provided significant physical assistance to Cruz. See PSAMF ¶ 67; cf. DSAMF ¶ 67. Nordan also has presented evidence that the same officer placed Cruz in a wheelchair and took him to see Welsh, Cruz appeared extremely physically weak, and that Cruz "slid out of the wheelchair and onto the floor." PSAMF ¶¶ 69–70; cf. DSMF ¶ 42; DSAMF ¶¶ 69–70.

That evening, Welsh went to Cruz's cell to check his temperature and give him his blood pressure medication. See PSAMF ¶ 73; DSMF ¶ 43; DSAMF ¶ 73; cf. PSMF ¶ 43. When Cruz informed Welsh that he was unable to stand and walk, Welsh instructed him to "get out of his bunk and move around to keep his joints and limbs moving." DSMF ¶ 43; see PSAMF ¶ 74. About two hours later, a Jail officer advised Welsh that Cruz "was not moving." DSMF ¶ 44; see PSMF ¶ 44. Welsh and several officers performed CPR "until EMS arrived and took over resuscitative

efforts." DSMF ¶ 45; see PSMF ¶ 45; PSAMF ¶ 75. On January 19, 2021, at 10:33 p.m., EMS pronounced Cruz dead. See DSMF ¶ 46; PSMF ¶ 46; PSAMF ¶ 75.

II.

The parties move to seal exhibits. See [D.E. 99, 110, 112]. These motions and defendants' proposed sealed filings do not comply with this court's local rules and Section V of the CM/ECF Policy Manual. The parties did not file supporting memoranda of law analyzing the factors required by Section V.G.1.(a). The docket entries for defendants' proposed sealed exhibits do not "describe the type of document it is" in order to "give the public notice of the request to seal and a reasonable opportunity to challenge it." Local Civ. R. 79.2(b)(1); CM/ECF Policy Manual Section V.G.1.(b). "Although non-compliance with this Court's Local Rules provides a sufficient basis to deny the Sealing Motion," the court "exercises its discretion to consider the merits of the request." Ford v. Hooks, No. 1:19-CV-444, 2021 WL 879966, at *3 (M.D.N.C. Mar. 9, 2021) (unpublished).

The "public and press have a qualified right of access to judicial documents and records filed in civil and criminal proceedings." United States ex rel. Oberg v. Nelnet, Inc., 105 F.4th 161, 170–71 (4th Cir. 2024) (quotation omitted); Doe v. Pub. Citizen, 749 F.3d 246, 265 (4th Cir. 2014); see Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 580 n.17 (1980); Nixon v. Warner Commc'ns., Inc., 435 U.S. 589, 597 (1978); Media Gen. Operations, Inc. v. Buchanan, 417 F.3d 424, 428 (4th Cir. 2005). "The right of public access springs from the First Amendment and the common-law tradition that court proceedings are presumptively open to public scrutiny." Doe, 749 F.3d at 265; Va. Dep't of State Police v. Wash. Post, 386 F.3d 567, 575 (4th Cir. 2004). "Because there are two sources, the right protected by each varies." Oberg, 105 F.4th at 171.

The First Amendment applies to the parties' exhibits filed in connection with defendants' motion for summary judgment. See Oberg, 105 F.4th at 171–72; Doe, 749 F.3d at 268; Rushford v. New Yorker Mag., Inc., 846 F.2d 249, 252–53 (4th Cir. 1988); Craven v. Novelli, 661 F. Supp. 3d 430, 456 (W.D.N.C. 2023), aff'd, No. 23-1393, 2024 WL 1952590 (4th Cir. May 3, 2024) (per curiam) (unpublished); Ford, 2021 WL 879966, at *4. The court may restrict access "only if closure is necessitated by a compelling government interest and the denial of access is narrowly tailored to serve that interest." Oberg, 105 F.4th at 171 (cleaned up); see Doe, 749 F.3d at 266; In re Washington Post Co., 807 F.2d 383, 390 (4th Cir. 1986). "Limiting public access to summary judgment filings requires the Court to articulate specific findings that sealing is essential to preserve higher values, sealing is narrowly tailored to serve that interest, and less restrictive alternatives to sealing are inadequate . . . . Before sealing, the Court must also provide notice to the public and an opportunity to object, which can be accomplished by docketing the motion to seal in advance of deciding the issue." Schrof v. Clean Earth, Inc., No. 1:22-CV-1533, 2025 WL 958593, at *2 (D. Md. Mar. 31, 2025) (unpublished) (citations omitted).

The court has provided adequate notice to the public and an opportunity to object. The motions have been pending for several months, and "[n]o party or member of the public has filed anything in the intervening time period." Ford, 2021 WL 879966, at *4; see Schrof, 2025 WL 958593, at *2; Craven, 661 F. Supp. 3d at 458. The parties have filed materials (including law enforcement investigation records, Cruz's autopsy report, and medical records) that courts have deemed appropriate for sealing. See, e.g., Slone v. Racer, No. CV 3:23-636, 2025 WL 407004, at *2 (S.D. W. Va. Feb. 5, 2025) (unpublished); Craven, 661 F. Supp. 3d at 458; Smith v. City of Greensboro, No. 1:19-CV-386, 2022 WL 18859223, at *3–4 (M.D.N.C. Oct. 24, 2022) (unpublished); Norton v. Tabron, No. 7:16-CV-56, 2017 WL 4542388, at *7 (E.D.N.C. Oct. 11,

2017) (unpublished), aff'd, 727 F. App'x 762 (4th Cir. 2018) (per curiam) (unpublished). The public has adequate information about the case through the parties' unsealed memoranda of law and statements of material fact and this order, and no one has objected to sealing the exhibits. The public's right of access to such information is substantially outweighed by the compelling interest in maintaining the proposed exhibits under seal. Moreover, sealing these exhibits is narrowly tailored to protect that interest, and less drastic alternatives to sealing are inadequate. Thus, the court grants the parties' motions to seal.

### III.

A court may grant summary judgment when, after reviewing the record as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleadings, see Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. See Anderson, 477 U.S. at 248–49. In doing so, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. See Scott, 550 U.S. at 378.

### A.

Count one alleges that Gerrell, Southerland, Welsh, and Craig acted with deliberate indifference to Cruz's serious medical needs, resulting in his death. See Compl. ¶¶ 201–211. The

11

Due Process Clause of the Fourteenth Amendment "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" Short v. Hartman, 87 F. 4th 593, 608–09 (4th Cir. 2023) (quoting Kingsley v. Hendrickson, 576 U.S. 389, 398 (2015)), cert. denied, 144 S. Ct. 2631 (2024); see Jenkins v. Woodard, 109 F.4th 242, 250 n.3 (4th Cir. 2024); Williamson v. Stirling, 912 F.3d 154, 178 (4th Cir. 2018); Dilworth v. Adams, 841 F.3d 246, 252 (4th Cir. 2016). Moreover, the Fourteenth Amendment's Due Process Clause guarantees a pretrial detainee "adequate medical care and freedom from deliberate indifference to his serious medical needs." Tarashuk v. Givens, 53 F.4th 154, 164 (4th Cir. 2022); see Greene v. Crawford Cnty., Michigan, 22 F.4th 593, 605 (6th Cir. 2022); Mays v. Sprinkle, 992 F.3d 295, 301 (4th Cir. 2021); Sandoval v. Cnty. of San Diego, 985 F.3d 657, 667 (9th Cir. 2021).

In order to survive summary judgment on this claim, plaintiff must produce evidence from which a reasonable jury could find that Cruz:

> (1) had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, [Cruz] was harmed.

Short, 87 F.4th at 611.

The court grants Craig's motion for summary judgment on count one. Craig was "employed by a different company" and relied on Southerland to make arrangements for Cruz to receive dialysis. Banks v. Gore, 738 F. App'x 766, 771 (4th Cir. 2018) (per curiam) (unpublished); see, e.g., Gonzalez v. Turner, No. 1:22-CV-85, 2025 WL 818183, at *8 (W.D. Ky. Mar. 13, 2025) (unpublished); Walker v. S. Health Partners, 576 F. Supp. 3d 516, 541 (E.D. Ky. 2021); cf. Bost

12

v. Wexford Health Sources, Inc., No. CV 15-3278, 2018 WL 3539819, at *32 (D. Md. July 23, 2018) (unpublished).

The court grants Gerrell's motion for summary judgment on count one. Gerrell "did not have significant involvement in" treating Cruz. Gonzalez, 2025 WL 818183, at *7–8; see Est. of Beauford v. Mesa Cnty., 35 F.4th 1248, 1272–73 (10th Cir. 2022); Banks, 738 F. App'x at 771; Walker, 576 F. Supp. 3d at 539.

As for Welsh and Southerland, Nordan has produced evidence that would allow a reasonable jury to find in his favor on count one. See, e.g., Walker, 576 F. Supp. 3d at 540; Bost, 2018 WL 3539819, at *25–28. Thus, the court denies defendant's motion for summary judgment on count one as to Welsh and Southerland.

In opposition, Welsh and Southerland argue that they are entitled to qualified immunity. See [D.E. 95] 17–19. "Historical analysis does not reveal a firmly rooted tradition of qualified immunity for employees of private, systematically organized medical providers like" SHP. Davis v. Buchanan Cnty., Missouri, 11 F.4th 604, 617 (8th Cir. 2021); see, e.g., Filarsky v. Delia, 566 U.S. 377, 393 (2012); Richardson v. McKnight, 521 U.S. 399, 412 (1997); Sanchez v. Oliver, 995 F.3d 461, 467 (5th Cir. 2021); Tanner v. McMurray, 989 F.3d 860, 865 (10th Cir. 2021); Est. of Clark v. Walker, 865 F.3d 544, 551 (7th Cir. 2017); Harrison v. Ash, 539 F.3d 510, 521 (6th Cir. 2008); Hinson v. Edmond, 192 F.3d 1342, 1347 & n.4 (11th Cir. 1999), amended by, 205 F.3d 1264 (11th Cir. 2000); Tovilla v. Woodard, No. 5:20-CT-3199, 2021 WL 3863351, at *4 n.19 (E.D.N.C. Aug. 30, 2021) (unpublished). Moreover, because the court denies defendants' motion for summary judgment on count one as to Welsh and Southerland, the court declines to address their contention that Nordan is not entitled to punitive damages on count one. Compare [D.E. 95] 26, with Cooper v. Dyke, 814 F.2d 941, 948 (4th Cir. 1987), and Freeman v. Turner, No. 4:13-

13

CV-129, 2015 WL 5571905, at *14 (E.D.N.C. Apr. 27, 2015) (unpublished); cf. Morris v. Bland, 666 F. App'x 233, 240 (4th Cir. 2016) (per curiam) (unpublished); Brown v. Owens, No. 5:16-CT-3251, 2018 WL 3827387, at *4 (E.D.N.C. July 10, 2018) (unpublished), report and recommendation adopted, 2018 WL 3825163 (E.D.N.C. Aug. 10, 2018) (unpublished). Thus, the court denies defendants' motion for summary judgment on count one as to Welsh and Southerland, including plaintiff's request for punitive damages.

B.

Count three alleges that SHP "had an official policy or custom of deliberate indifference to the serious medical needs of prisoners with serious or chronic medical needs who require life-sustaining medical treatments" in violation of 42 U.S.C. § 1983. Compl. ¶¶ 243–252. In analyzing defendants' motion for summary judgment, the court applies "general principles of municipal liability." Austin v. Paramount Parks, Inc., 195 F.3d 715, 727 (4th Cir. 1999); see West v. Atkins, 487 U.S. 42, 54–58 (1988); Rodriguez v. Smithfield Packing Co., 338 F.3d 348, 355 (4th Cir. 2003); Conner v. Donnelly, 42 F.3d 220, 228 (4th Cir. 1994); Bost v. Wexford Health Sources, Inc., No. CV 15-3278, 2022 WL 4290528, at *28 (D. Md. Sept. 16, 2022) (unpublished); Smith v. Atkins, 777 F. Supp. 2d 955, 968 (E.D.N.C. 2011).

When suing a municipality, a plaintiff must prove that a policy or custom attributable to the municipality caused the violation of the plaintiff's federally protected rights. See Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 403–05 (1997); Hafer v. Melo, 502 U.S. 21, 25 (1991); Kentucky v. Graham, 473 U.S. 159, 166 (1985); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–94 (1978); King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016); Owens v. Balt. City State's Att'ys Off., 767 F.3d 379, 402–03 (4th Cir. 2014); Santos v. Frederick Cnty. Bd. of Comm'rs, 725 F.3d 451, 469–70 (4th Cir. 2013); Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003);

14

Carter v. Morris, 164 F.3d 215, 218–19 (4th Cir. 1999); Hill v. Robeson Cnty., 733 F. Supp. 2d 676, 688–89 (E.D.N.C. 2010). "Monell's policy or custom requirement applies" in section 1983 cases regardless "of whether the relief sought is monetary or prospective." Los Angeles Cnty., v. Humphries, 562 U.S. 29, 39 (2010). There are four ways in which liability for a policy or custom may arise:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifests deliberate indifference to the rights of citizens; or (4) through a practice that is so persistent and widespread as to constitute a custom or usage with the force of law.

Lytle, 326 F.3d at 471 (cleaned up).

A violation results from a municipal entity's policy or custom if the violation resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell, 436 U.S. at 690; see City of St. Louis v. Praprotnik, 485 U.S. 112, 121–23 (1988). Even if a section 1983 plaintiff can identify the requisite final policymaking authority under state law, a municipality is not liable simply because a section 1983 plaintiff can "identify conduct attributable to the municipality." Riddick v. Sch. Bd. of Portsmouth, 238 F.3d 518, 524 (4th Cir. 2000). Instead, a section 1983 "plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged." Brown, 520 U.S. at 404 (cleaned up); see City of Canton v. Harris, 489 U.S. 378, 389–90 (1989); Riddick, 238 F.3d at 524. Thus, to avoid imposing respondeat superior liability on municipalities, a section 1983 plaintiff must show that "a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." Brown, 520 U.S. at 411; see Harris, 489 U.S. at 392; Riddick, 238 F.3d at 524; Carter, 164 F.3d at 218–19.

15

"Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999), abrogated on other grounds by Short, 87 F.4th at 609. Deliberate indifference requires "proof that a municipal actor disregarded a known or obvious consequence of his action" or inaction. Brown, 520 U.S. at 410. Moreover, even if a section 1983 plaintiff can show the requisite culpability, a section 1983 plaintiff also must show "a direct causal link between the municipal action [or inaction] and the deprivation of federal rights." Id. at 404.

To establish a policy or custom, Nordan "must point to a persistent and widespread practice" by SHP, "the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference." Owens, 767 F.3d at 402 (cleaned up). An official policy "may be found in written ordinances and regulations," "in certain affirmative decisions of individual policymaking officials," "or in certain omissions on the part of policymaking officials that manifest deliberate indifference to the rights of citizens." Carter, 164 F.3d at 218. A "custom may arise if a practice is so persistent and widespread and so permanent and well settled as to constitute a custom or usage with the force of law." Id. (cleaned up). To establish causation, plaintiff must point to a "specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Spell v. McDaniel, 824 F.2d 1380, 1390 (4th Cir. 1987) (cleaned up); see Carter, 164 F.3d at 218.

Nordan relies on the deaths of five other inmates at the Jail in the two years before Cruz's death, including the death by suicide of an inmate nine days before Cruz died. Nordan also notes that "SHP has been named as a defendant in over 500 federal lawsuits." [D.E. 104] 24–25.

Nordan's "entirely conclusory" argument "fails to present any evidence demonstrating a widespread policy or custom of deliberate indifference by SHP." Harrington v. S. Health Partners, Inc., No. 1:21-CV-744, 2023 WL 3393569, at *15 (M.D.N.C. May 11, 2023) (unpublished); see Anderson v. S. Health Partners, Inc., No. 4:20-CV-95, 2022 WL 288223, at *12 (E.D.N.C. Jan. 31, 2022) (unpublished); cf. Bost, 2022 WL 4290528, at *34; Smith, 777 F. Supp. 2d at 968. Moreover, Nordan improperly focuses on the alleged failure of SHP employees and contractors to provide Cruz with medical treatment rather than "some specific deficiency" that would "make the specific violation almost bound to happen." Harrington, 2023 WL 3393569, at *15 (quotation omitted); see Anderson, 2022 WL 288223, at *12; Smith, 777 F. Supp. 2d at 968. Thus, the court grants defendants' motion for summary judgment on count three.

C.

Count six alleges a state-law medical malpractice claim against SHP, Gerrell, Southerland, Welsh, and Craig. See Compl. ¶¶ 272–84. Defendants seek summary judgment on this claim only as to defendant Gerrell and argue that plaintiff failed to comply with North Carolina Rule of Civil Procedure 9(j). See [D.E. 95] 23–26.

The court denies the motion. See Pledger v. Lynch, 5 F.4th 511, 518–24 (4th Cir. 2021); Ford v. Pitt Cnty. Mem'l Hosp. Inc., No. 5:24-CV-71, 2025 WL 495554, at *3–4 & n.10 (E.D.N.C. Feb. 13, 2025) (unpublished); Jackson-Shakespeare v. Novant Healthcare Inc., No. 3:22-CV-317, 2023 WL 8809291, at *2 (W.D.N.C. Dec. 20, 2023) (unpublished) (collecting cases); Moreno v. Ahmed, No. 1:19-CV-360, 2023 WL 3948291, at *25 (M.D.N.C. June 12, 2023) (unpublished), report and recommendation adopted, 2023 WL 4686904 (M.D.N.C. July 21, 2023) (unpublished). Moreover, the court declines defendant's invitation to remand count six to state court. See 28

17

U.S.C. § 1367; cf. Royal Canin U.S.A., Inc. v. Wullschleger, 604 U.S. 22, 27–28 (2025); Montano v. City of Chi., 375 F.3d 593, 599 (7th Cir. 2004).

IV.

In sum, the court GRANTS the parties' motions to seal [D.E. 99, 110, 112], and GRANTS plaintiff's motion for leave to manually file exhibits [D.E. 109]. The court GRANTS in part defendants' motion for summary judgment [D.E. 94], and DISMISSES count one of the complaint as to defendants Craig and Gerrell and DISMISSES count three. Count one remains against defendants Welsh and Southerland and count six remains. The parties SHALL participate in a court-hosted settlement conference with United States Magistrate Judge Robert T. Numbers, II. If the case does not settle, the parties SHALL propose trial dates.

SO ORDERED. This 12 day of August, 2025.

JAMES C. DEVER III
United States District Judge